# AFFIDAVIT IN SUPPORT OF
# CRIMINAL COMPLAINT

I, FBI Special Agent Dillon J. Torno, depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since March 2020. I am currently assigned to the FBI's New Hampshire Safe Streets Gang Task Force ("NHSSGTF") where I am tasked with investigating violent gangs and drug trafficking activity throughout the state of New Hampshire. From 2014 to 2020, I served as a Boarding Officer for the United States Coast Guard specializing in narcotics interdictions. During my law enforcement experience, I have had the opportunity to search for, and seize, illegal narcotics, firearms, and other evidence of federal crimes. I have conducted or participated in physical surveillance, the handling of confidential human sources, narcotics detection techniques, and the execution of search and arrest warrants. I am familiar with all aspects of conducting narcotics investigations.

2. This affidavit is submitted in support of a criminal complaint charging:

**Robert C. Corson**
**DOB: September 7,**

with violating 21 U.S.C. § 841(a)(1) and (b0(1)(C)– Distribution of Controlled Substances, specifically, methamphetamine and fentanyl, Schedule II controlled substances.

3. The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, and physical surveillance conducted in connection with persons and places mentioned in this affidavit. This affidavit is intended to show there is probable cause for the requested complaint and does not set forth the entirety of my knowledge about this matter.

## STATUTORY AUTHORITY

4. Title 21, United States Code, Section 841(a)(1) provides, in pertinent part, that it is "unlawful for any person knowingly or intentionally . . . possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Methamphetamine is a Schedule II controlled substance.

## PROBABLE CAUSE

5. Since April of 2021, a New Hampshire State Police ("NHSP") confidential source ("CS 1") has been providing information to the NHSP in exchange for consideration of pending criminal charges. CS #1 has various misdemeanor convictions for drug possession and motor vehicle violations. I believe the information CS #1 has provided to date to the NHSP is truthful and reliable, as CS #1's information has been corroborated to the extent possible by audio and video recordings, surveillance, information obtained from public records, and other sources.

6. On April 13, 2021, a NHSP trooper assigned to NHSP's Narcotics Intelligence Unit ("NIU") was working in an undercover capacity ("UC") as part of an ongoing investigation into Corson's suspected drug trafficking activities. The NHSP NIU had previously developed information from CS #1 that Corson was arranging and conducting drug sales within a second-floor apartment located at ███████████ in Portsmouth, New Hampshire ("the apartment").

7. On this date, the UC directed CS #1 to arrange with Corson to purchase an "eight ball" (approximately 3.5 grams) of methamphetamine.[1] The UC and a second NHSP NIU trooper

---

[1] Prior to the start of the operation, CS #1 positively identified Corson as the person CS #1 had previously made drug purchases from within the apartment. Also, CS #1 was searched by the NHSP NIU

met with CS #1 briefly at a prearranged location after which CS #1 traveled to the apartment to attempt to contact Corson. CS #1 remained under law enforcement surveillance during this period and maintained continuous contact with the UC.

8. While CS #1 was in the apartment, CS #1 reported to the UC that at least three people were inside the apartment waiting to purchase, or actively purchasing, narcotics from Corson.[2]

9. Shortly after, CS #1 returned to the prearranged location and met with members of the NHSP NIU. CS #1 confirmed that CS #1 had arranged with Corson to purchase one "eight ball" of methamphetamine from Corson in exchange for $150.00.

10. The UC was equipped with an audio/recording device and CS #1 was provided with $150.00 in serialized funds. The UC and CS #1 walked to the apartment under law enforcement surveillance and entered the rear entry door of the apartment. Once inside, the UC and CS #1 made contact with Corson and an unidentified female within a bedroom and had a brief casual conversation. During this time, the UC observed (and as depicted on video) Corson preparing and packaging suspected narcotics.

11. Approximately three minutes later, Corson handed CS #1 a quantity of suspected methamphetamine and CS #1 handed Corson the $150.00. CS #1 immediately handed the suspected narcotics to the UC.

---

officers before and after each controlled purchase of narcotics referenced herein for illicit contraband, weapons, or unexplained United States currency with negative results.

[2] During this time, law enforcement surveillance units observed a vehicle arrive outside the apartment and observed a male and female exit the vehicle and enter the apartment.

12. The UC and CS #1 exited the apartment and returned on foot to the prearranged location. Once there, the UC provided the suspected narcotics to another NHSP trooper who utilized a TruNarc Handheld Narcotics Analyzer to conduct a field test of the drug evidence which tested presumptive positive for the controlled substance methamphetamine. The trooper submitted the drug evidence the NHSP's forensic laboratory ("NHSP Lab") where the results are pending.

13. On April 28, 2021, CS #1, while acting under the NHSP NIU's direction, arranged with Corson to purchase approximately seven grams of methamphetamine and approximately 10 grams of fentanyl in exchange for $525.00.

14. Shortly after, the UC and another trooper met with CS #1 at a prearranged location where the UC equipped himself with an audio/video recording device and CS #1 was provided with $525.00 in serialized U.S. currency.[3] The UC and CS #1 walked to the apartment and entered through the rear entry door.

15. Once inside, Corson provided the suspected narcotics to CS #1 who handed Corson the $525.00. CS #1 immediately provided the UC with the suspected narcotics. The UC and CS #1 exited the apartment and returned to the prearranged location. Once there, the UC provided the suspected narcotics to another NHSP trooper who observed that the evidence consisted of two yellow colored resealable jewelry bags. The first bag contained a quantity of a crystalline substance consistent in general appearance with the controlled substance crystal methamphetamine. The second bag contained a quantity of an off-white powdery substance consistent in appearance to the controlled substance fentanyl. The trooper utilized a TruNarc

---

[3] The NHSP later determined that the UC's audio/video recording device malfunctioned and therefore no audio/video recording of the drug purchase was obtained.

machine and received a presumptive positive result for the crystalline substance for methamphetamine and an "inconclusive" result for the suspected fentanyl. The NHSP lab subsequently analyzed the substances and confirmed that the crystalline substance was methamphetamine and that the suspected fentanyl consisted of acetyl fentanyl, fentanyl and methamphetamine.

16. On May 26, 2021, the UC and another trooper met with CS #1 at a prearranged location where the UC equipped himself with audio/recording equipment and $230.00 in serialized currency for the purchase of quantities of methamphetamine and Xanax pills from Corson at the apartment.

17. The UC and CS #1 travelled on foot to the apartment and entered through the rear entry door. Once inside the apartment, the UC and CS #1 met with Corson in his bedroom. The UC handed Corson the $230.00. Corson walked to the end of his bed and opened a safe under the bed and placed the currency in the safe. Corson then removed two large bags one of which contained a white crystal-like substance consistent with the controlled substance methamphetamine. The second bag contained a quantity of white rectangular pills consistent with Xanax pills.

18. Corson then removed a quantity of the crystal-like powder, weighed it out on a scale and put it into a smaller baggie. Corson next removed ten pills from the second large bag and placed them into another small plastic baggie. Corson handed both baggies to the UC. While in the bedroom, the UC observed baggies at the end of Corson's bed containing a large quantity of brown powder and chunks consistent with heroin/fentanyl. An unidentified female slept in the bed throughout the drug transaction.

19.     The UC and CS #1 exited the apartment and returned on foot to the prearranged location. Once there, the UC provided the suspected narcotics to another law enforcement officer who utilized a TruNarc Handheld Narcotics Analyzer to conduct a field test of the drug evidence. The crystal-like substance tested presumptive positive for the controlled substance methamphetamine and the pills tested presumptive positive for Alprazolam (Xanax). The drug exhibits have been submitted to the United States Drug Enforcement Administration's forensic laboratory for further analysis.

## CONCLUSION

20.     Based upon the information set forth above, I submit that there is probable cause to believe that on the dates referenced herein in the District of New Hampshire, Robert C. Corson distributed controlled substances, in violation of 21 U.S.C. § 841(a)(1) and (b0(1)(C).

Respectfully submitted,

/s/ Dillon J Torno
Dillon J. Torno, Special Agent
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date:  7/29/2021

/s/ Andrea K. Johnstone
HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE